Filed 3/24/26  REM Construction v. Wheatland Union High School Dist. CA3

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| REM CONSTRUCTION, INC., | C100232 |
| Plaintiff and Respondent, | (Super. Ct. No. CVCV21-00847) |
| v. | |
| WHEATLAND UNION HIGH SCHOOL DISTRICT, | |
| Defendant and Appellant. | |

REM Construction, Inc. (REM), sued Wheatland Union High School District (the District) for breach of a public works contract to modernize a high school.  REM alleged it performed all work required under the contract, but the District failed to pay it the full contract price.  Following a week-long bench trial, the trial court entered judgment in favor of REM.  The District appeals, arguing that REM's lawsuit is barred because it failed to comply with all steps of the contract's claim resolution process, and compliance with that process is a condition precedent to litigation.  In particular, the District argues (1) REM's claim was untimely, and (2) even if it was timely, REM did not complete the

1

final step of the claim resolution process, namely, mediation. The trial court rejected the District's arguments, finding the claim was timely and that any failure to mediate was the District's fault. We agree and thus affirm.

## THE RELEVANT CONTRACT PROVISIONS

Because it is the focus of this appeal, we begin with a description of the relevant contract provisions—specifically, section 25 of the contract governing "Claims."[1] A "Claim" is defined as a "separate demand by Contractor . . . for one or more of the following": (1) "A time extension, including . . . for relief from damages or penalties for delay assessed by District under this Agreement"; (2) "Payment by the District of money . . . arising from work done by . . . Contractor pursuant to the Agreement and payment for

---

[1] Many of the relevant contract provisions are identical to provisions in Public Contract Code section 9204, which creates a claim resolution process for public works projects in order to ensure that contractors are "paid in full and in a timely manner" for work "that is complete and not in dispute." (Pub. Contract Code, § 9204, subd. (a).) Section 9204 provides "a public entity may prescribe reasonable . . . claim[] and dispute resolution procedures and requirements in addition to the provisions of this section, so long as the contractual provisions do not conflict with or otherwise impair the timeframes and procedures set forth in this section." (*Id*., subd. (f).) As potentially relevant here, sections 25.4, 25.7.2, and 25.9 of the parties' contract contain "procedures and requirements in addition to the provisions of" Public Contract Code section 9204. The District cites section 9204 but fails to demonstrate that it affects any of our conclusions in this case. We note that whether we are interpreting the parties' contract or the identical provisions of section 9204, our review is de novo. (See *Filtzer v. Ernst* (2022) 79 Cal.App.5th 579, 583 ["de novo standard of review" applies where no extrinsic evidence was admitted concerning the contract's meaning]; *Michaels v. State Personnel Bd.* (2022) 76 Cal.App.5th 560, 567 ["questions of statutory interpretation are subject to the de novo standard of review"].) We also note the District drafted the contract, and any contract provisions that do not appear in section 9204 are subject to the " ' "well established rule of construction" that any ambiguities must be construed against' the drafter, where the uncertainty cannot be resolved by other rules of contract interpretation." (*Breathe Southern California v. American Lung Assn.* (2023) 88 Cal.App.5th 1172, 1182.)

which is not otherwise expressly provided or to which the claimant is not otherwise entitled"; and (3) "Payment of an amount that is disputed by the District."

The contract provides, "Compliance with . . . the claim submission procedures described in this Claims section is an express condition precedent to Contractor's right to commence litigation . . . . The Contractor cannot . . . assert or bring any Claim in any . . . subsequent legal action until that Claim has gone through the Claims Resolution Process herein." It also provides, "The procedures and provisions of this Claims section shall not apply to [¶] . . . District's determination of . . . whether the Work complies with the Contract Documents for purposes of accepting the Work."

The claim resolution process begins with the contractor's submission or presentation of a written claim, which must be done "within ten (10) calendar days from the date Contractor discovers or reasonably should discover, that an act, error, or omission of District, its agents or employees, or action, condition or other situation has occurred that may entitle Contractor to file a Claim." Upon receipt of a claim, the District shall review it and provide a written response within 45 days (or longer in certain circumstances) identifying what portion of the claim is disputed and what portion is undisputed, and it shall pay any undisputed portion of the claim within 60 days.

If the contactor disputes the District's response to the claim, it "may demand in writing an informal conference to meet and confer for settlement of the issues in dispute." Upon receipt of such a demand, the District "shall schedule a meet and confer conference within 30 days for settlement of the dispute." "Within 10 business days following the conclusion of the meet and confer conference, if the Claim or any portion of the Claim remains in dispute, the District shall provide the Contractor a written statement identifying the portion of the Claim that remains in dispute and the portion that is undisputed. Any payment due on an undisputed portion of the Claim shall be processed and made within 60 days after the District issues its written statement."

3

Finally, "Any disputed portion of the Claim, as identified by the contractor in writing, shall be submitted to nonbinding mediation . . . . If mediation is unsuccessful, the parts of the Claim remaining in dispute shall be subject to applicable procedures outside this section." The District acknowledges that "applicable procedures outside this section" includes litigation.

The contract also provides, "Failure by the District to . . . meet the time requirements" of the claim resolution process "shall result in the Claim being deemed rejected in its entirety."

## FACTUAL AND PROCEDURAL BACKGROUND

As the sole issue on appeal is whether REM's lawsuit is barred by its failure to comply with the contract's claim resolution process, our description of the factual and procedural background focuses on things that are relevant to that issue.[2] Additional facts and evidence are described in the relevant discussion section, below.

*Background Relevant to the District's Arguments on Appeal*

REM entered into a written contract with the District to modernize 40 classrooms at a high school for a total price of approximately $2.98 million. REM completed the bulk of the work during the summer of 2019, and the District took possession of the classrooms in August and classes began as scheduled. However, REM continued to work on "punch list" items for several months. A punch list is a list of items that remain to be completed or corrected, and it is prepared by the project's architect as the project nears completion. As found by the trial court, "The contractor fixes items on the punch list, there is re-inspection, possibly a new punch list, more fixing and so on until the District determines all items are complete."

---

[2] Following the bench trial, the court issued a written statement of decision on the merits that contains numerous findings of fact. Neither party challenges those findings and we thus rely on them in our description of the underlying facts.

A dispute arose between the parties, and the District ultimately refused to pay REM approximately $220,600 of the contract price. The parties' dispute centered primarily on two issues. The first related to the punch list. The District contended REM either failed to complete some of the contract work or completed it deficiently, as identified on the punch list, and the District threatened to self-perform that work and deduct its costs from the contract price. REM, in contrast, contended it satisfactorily completed all items on the punch list that were within the scope of its work. The second issue involved the District's contention that REM had overbilled for work it had done pursuant to previously approved change orders (we occasionally refer to this as the "overbilling issue"). Although the District had already paid for this work, it threatened to withhold or recoup those amounts from any remaining payments due on the contract. In addition to the punch list and overbilling issues, the parties also disputed whether the District should approve four additional proposed change orders totaling approximately $20,000,[3] and the District was threatening to impose damages on REM for delays in completing the project (it would apparently impose those damages by subtracting them from any remaining amounts due under the contract).

In October, November, and December, the parties were working through the punch list. On December 23 or 24, REM sent the District an updated punch list showing that, with a few minor exceptions, all items were either completed or were not within the scope of its work. As to the minor exceptions, REM gave an estimate of when the work would be completed.

---

[3] These *proposed* change orders are different than the previously *approved* change orders that gave rise to the overbilling issue. We note the trial court ultimately found that REM was not entitled to payment on the proposed change orders because "they were never mentioned in the claim and, thus, *despite the apparent merit of three of them*, cannot be the basis of any recovery." (Italics added.) In other words, the trial court found the portion of REM's claim that concerned the proposed change orders was barred because REM failed to comply with the claim resolution process as to that portion.

On December 26, the District asked REM to send it any pending proposed change orders so that it could "evaluate them."

On December 27, the District sent REM a letter stating: (1) it was in the process of auditing all previously approved change orders and had uncovered "substantial" overbilling and would provide "further communications" on this issue "soon"; (2) it would "self-perform the remaining floor wax work" and would withhold $13,000 from the contract price as a result;[4] and (3) it rejected all proposed change orders as untimely. The District also stated it would be willing to limit its imposition of delay damages to $10,000 if, among other things, REM would "make good faith efforts to achieve a just resolution and efficient close-out of this project."

On January 3, the District sent REM a letter stating its "initial review" of previously approved change orders had identified approximately $23,000 in overbilling and that the full amount of overbilling was not readily ascertainable because REM had provided inadequate documentation, and it demanded REM promptly provide certain documentation. The District also stated it could currently "defensibly retain" almost $90,000 from the contract price, consisting of (1) approximately $51,000 in delay damages, (2) $13,000 to complete the floor wax work, and (3) approximately $25,000 in overbilling.

On January 9, the District sent REM a letter stating, "numerous items on the Project that were supposedly completed have not, in fact, been completed," and it enclosed a spreadsheet (or updated punch list) identifying 11 such items and estimating it would cost $88,465.56 to complete those items itself. The District's letter concluded,

---

[4]     The trial court ultimately found the District was not justified in withholding any amount from the contract price due to the floor wax issue, and the District does not challenge this finding.

6

"Hopefully . . . the Parties can work cooperatively to resolve these issues in a timely manner."

On January 14, the District sent REM a letter stating it still had not received the documentation it had demanded regarding the previously approved change orders and asking that REM do so by January 17.

On January 15, the parties exchanged e-mails regarding work REM was performing that afternoon (including painting, replacing lights, and installing "the base on the science cabinets skirts"), and the status of some of the remaining punch list items. That evening, REM sent an e-mail stating it "will provide a work plan that lists the work it plans on performing and the projected dates for each item" by the end of the week, and the District confirmed it would "permit [REM] to furnish the work plan . . . for the District's consideration and sufficient time for its review and implementation if it is indeed acceptable to the District. Of course, this leaves the overbilling and delay damages issue live, and this action would be in reliance on what I understand to be your representation that work on the project has not ceased because the punch list is in progress."

On January 17, REM sent the District an e-mail stating the work plan would take a few more days to prepare, and the District responded, "Ok."

On January 27, the District sent REM a letter noting it still had not provided the work plan and asking when it would provide the documentation regarding the previously approved change orders. The District also enclosed a "current punch list reflecting the work the District will be self-performing and the estimated cost of self-performance." The "current punch list" enclosed with the January 27 letter is similar to the spreadsheet enclosed with the January 9 letter, but some of the items on it changed and the estimated cost to perform those items was now $69,960.51, rather than $88,465.56.

On January 30, REM sent the District a letter stating it had performed all items on the punch list that were within the scope of its work except some painting that it was

7

"ready, willing and able to complete." REM also noted the District "provide[d] no details to support [its] contention the punch list work performed in January is deficient" and it asked the District to "identify with particularity what work is deficient and why it is deficient." It also stated it was "willing to provide a credit to the District in the amount of $8,000 . . . to strip and re-seal the floor." Finally, it stated it would provide the requested documentation to the District on February 14.

On January 31, REM sent the District a letter disputing its contention it was entitled either (1) to be "repaid a portion of the amount it paid REM for certain work performed" pursuant to the previously approved change orders, or (2) to any damages for delay. The letter concluded, "REM is committed to closing out the project and resolving the issues without the need to resort to litigation."

On February 5, the District hand delivered a letter to REM (the letter was dated February 4), and it is the District's position that this letter triggered the claim submission deadline provided in the contract. The letter enclosed a resolution adopted by the District's board on February 3. The resolution stated the project was complete and it directed the superintendent to "disburse any remaining portion of the Contract Price under the Agreement . . . minus any amounts not otherwise due to Contractor including by way of illustration and not by limitation": (1) $30,708.01 "in readily identifiable change order charges . . . that were erroneously issued on the basis of inflated proposed change orders submitted by Contractor";[5] (2) $69,960.51 "as a reduction in the Contract Price to reflect the anticipated reasonable cost for the District to self-perform all remaining work for the project"; and (3) $2,599.20 "as a reduction to the Contract Price reflecting additional costs incurred by the District" because it had to perform additional

---

[5] This appears to refer to the overbilling issue. We note the trial court found there was no evidence introduced at trial regarding inflated change orders or overbilling, and the District does not challenge this finding.

8

inspections due to "Contractor's false representation that the Project was complete and ready for final inspection." In its letter, the District stated, "If REM has a proposal as to how it intends to resolve this dispute, it can communication that proposal . . . in writing. . . . The District clearly is interested in a cooperative close-out of the Project, but if REM is unwilling to cooperate, the District can continue to close-out the Project unilaterally."

On February 6 and 7, the parties again exchanged e-mails. REM asked the District to "confirm that [it] refuses to allow REM to perform the painting work as proposed in my letter to you of January 30," and the District responded, "<u>at present</u>, yes," but it would provide a more detailed response after it received the substantiating documentation regarding previously approved change orders that REM had stated it would provide by February 14.

On February 13, REM submitted an invoice to the District. The invoice identified a "current payment due" of $71,580.60, and a retention of $149,019.54, for a total amount still due of approximately $220,600 (i.e., the amount sought in this lawsuit).

On February 14, REM provided the District with the requested documentation regarding the previously approved change orders.

On February 26, the District sent a letter to REM, and REM contends (and the trial court found) it was this letter that triggered the claim submission deadline. The District stated it had reviewed the documentation regarding previously approved change orders and identified approximately $154,000 in overbilling, and it intended to withhold that amount from any remaining payment due, but REM "may be able to reduce this withholding" by "<u>immediately</u>" providing certain additional documentation. The District also stated it "will be withholding" an additional $80,257.94 "to self-perform the remainder of the Project," consisting of the $69,960.51 identified in the board resolution and $10,297.43 in "additional work . . . that has been recently identified."

9

On March 6, REM submitted a claim disputing the District's contentions it had (1) overbilled, or (2) failed to satisfactorily perform all required work. REM demanded the District immediately pay it the remaining contract price.

On April 10, the District sent REM a letter denying the claim on numerous grounds, including that it was untimely.

A little over a year later, on June 1, 2021, REM sent the District a "written demand for the informal meet and confer process." It appears the District never responded to this demand.

REM filed the present lawsuit in August 2021. It alleged it completed all work required by the contract, and the District breached the contract by failing to pay it the total amount due. It also alleged it submitted a claim and "requested the meeting" as required by the contract, but the District failed to comply with its duties and declined to meet. This breach of contract cause of action is the focus of this appeal.[6] The District filed an answer and, as an affirmative defense, alleged REM "failed to timely comply with all applicable contractually required claims procedures," and the lawsuit was barred as a result.

In late 2022, in response to an e-mail from REM's counsel regarding mediation, the District's counsel stated, "As for mediation, the District has always said no, but I'll talk to them again this week."

*The District's Motion for Judgment and the Trial Court's Ruling Thereon*

The matter proceeded to a bench trial. After REM finished presenting its evidence, the District filed a motion for judgment pursuant to Code of Civil Procedure

---

[6]     REM also asserted a cause of action for violation of prompt payment statutes and a cause of action alleging the District breached a separate contract involving the construction of bleachers on the high school campus. Like the parties, we do not discuss these causes of action because they are not at issue in this appeal.

section 631.8.[7]  The District argued REM (1) failed to timely file a claim, and (2) failed to complete all steps of the claim resolution process, including mediation, and its lawsuit was thus barred by section 25.4 of the contract, which, as noted, provides, "Compliance with . . . the claim submission procedures described in this Claims section is an express condition precedent to Contractor's right to commence litigation . . . .  The Contractor cannot . . . assert or bring any Claim . . . or subsequent legal action until that Claim has gone through the Claims Resolution Process herein."

REM opposed the motion, arguing, among other things:  (1) its claim was timely; (2) section 25.9.1 of the contract exempted the breach of contract claim at issue in the lawsuit from the claim resolution process; and (3) it was the District that refused to complete all steps of the claim resolution process because it never responded to REM's request for the informal meet and confer conference and it rejected REM's requests to mediate.[8]

The trial court denied the District's motion.  In doing so it found the claim was timely and that mediation was not required because the District did not respond to the meet and confer conference demand.

With regards to the timeliness of the claim, the trial court noted the various letters and e-mails between the parties showed "both sides [were] trying to work this out," and the District "was holding open the possibility" that "if you do this, this, and this" it would

---

[7]    Code of Civil Procedure section 631.8 provides, "After a party has completed his presentation of evidence in a trial by the court, the other party . . . may move for a judgment.  The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party."  Such a motion is similar to a motion for nonsuit in a jury trial.  (*Roth v. Parker* (1997) 57 Cal.App.4th 542, 549.)

[8]    In light of our conclusion that REM's claim was timely and not subject to mediation, we need not address whether the claim was exempt from the claim resolution process under section 25.9.1 of the contract.

"release the amounts . . . owing" to REM. It found it did not become clear the District was not going to pay REM any additional monies until it sent the February 26 letter, and REM's claim, which was filed on March 6 (or nine days thereafter) was thus timely. Prior to the February 26 letter, there was "an ongoing discussing, an ongoing luring, basically, leading the contractor to believe, look, you can rely on our good faith here. We are going to—this is a matter that hasn't proceeded to the point where we are basically saying no, . . . we are not going to pay you. [¶] That moment didn't occur until that letter."

Finally, the trial court found, "There were requests for mediation, a request for that meet-and-confer conference that were ignored" by the District. It also found the meet and confer conference was not mandatory because the contract provides the contractor "may" request such a conference, and "the happening of the meet-and-confer conference is a condition precedent" to mediation. "And so mediation—the next step in the process, from an unsuccessful meet-and-confer conference, could have been nonbinding mediation. [¶] It never got to that because the district failed to respond . . . so the whole process is derailed."

*The Conclusion of Trial and the Trial Court's Statement of Decision*

After the trial court denied the District's motion for judgment, the trial continued and the trial court ultimately issued a statement of decision finding in favor of REM on the merits, at least in part. In particular, it found REM did substantially all the things required under the contract and the District breached the contract by failing to pay it all required amounts. It calculated the "proper amount due under the contract" as the unpaid balance of the contract price (i.e., $220,600.15) minus $30,940.80 for items it found REM did not adequately complete, for a total of $189,659.35. It also awarded statutory penalties, interest, and costs and attorney fees, bringing the total amount awarded to

$465,252.13.[9] In its statement of decision, the trial court noted, "The District reasserts . . . that REM's claim was untimely. The court denied these arguments at the time of the District's motion for judgment during the trial. The court continues to find the argument that REM's claim was untimely or not in compliance with the contract documents or claims statutes without merit."

Judgement was entered accordingly, and this appeal followed.

## DISCUSSION

The sole issue on appeal is whether the trial court erred in finding REM's lawsuit was not barred by its failure to comply with the claim resolution process. The District does not claim the judgment is otherwise in error. Instead, the District argues only that the trial court should have found REM's lawsuit was barred because (1) its claim was not timely, and (2) even if it was timely, it never completed the final step of the claim resolution process (i.e., mediation).

### A. *Standard of Review*

In reviewing a judgment following a bench trial, we review questions of law de novo, and we review the trial court's findings of fact for substantial evidence. (*Pearce v. Briggs* (2021) 68 Cal.App.5th 466, 473.) Some of the issues raised in the appeal involve the interpretation of the parties' contract, which we review de novo. (*Filtzer v. Ernst, supra*, 79 Cal.App.5th at p. 583 [we "apply a de novo standard of review to interpret a contract" where no extrinsic evidence was admitted concerning the contract's meaning].) However, the question of whether REM's claim was timely is analogous to a statute of limitations issue, and "[r]esolution of a statute of limitations issue is normally a question of fact. [Citation.] 'The trial court's finding on the accrual of a cause of action for statute of limitations is upheld on appeal if supported by substantial evidence.' " (*Pearce*, at

---

[9]    The District does not challenge this portion of the judgment other than to note the fee award must be reversed if the underlying judgment is reversed.

13

p. 474; see also *Brewer v. Remington* (2020) 46 Cal.App.5th 14, 28 [" '[t]here are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge. [Citation.] It is a question for the trier of fact' "]; *Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 106 ["The date that a person in the exercise of reasonable diligence should have discovered the facts is a question of fact. [Citations.] We review the trial court's finding [on this issue] under the substantial evidence test"].) "Under the deferential substantial evidence standard of review, findings of fact are liberally construed to support the judgment or order and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. [Citation.] 'A single witness's testimony may constitute substantial evidence to support a finding. [Citation.] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. [Citation.] "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." ' " (*Powell v. Tagami* (2018) 26 Cal.App.5th 219, 231.)

B. *The Lawsuit Asserts a "Claim" as Defined by the Contract*

The first issue we address is whether the breach of contract claim asserted in this lawsuit is a "claim" as that term is defined by the contract. To the extent the trial found it was not, we disagree. As noted, the contract defines a claim as a demand by the contractor for: (1) "A time extension"; (2) "Payment by the District of money . . . arising from work done by, or on behalf of, Contractor pursuant to the Agreement and payment for which is not otherwise expressly provided or to which the claimant is not otherwise entitled"; or (3) "Payment of an amount that is disputed by the District." The trial court found REM was not demanding a time extension and the first definition thus did not apply, and neither party suggests otherwise. The trial court also found the second definition did not apply because REM was demanding payment of the full contract price, which was something the contract expressly provided it was entitled to. The trial court

14

found the second definition encompassed claims for "payment outside of the contract,"[10] which "would imply, if it's outside the contract, then payment of the contract amount is something that is not the subject of a claim." The trial court then went on, "So if that's true, then the third [definition] . . . cannot mean, when it says, 'Payment of an amount that is disputed by the district,' it cannot mean amounts due under the contract. That would be internally inconsistent. It can't mean that." We disagree with the trial court's conclusion that the second definition of a claim somehow means the third definition cannot mean what it says. A claim includes a demand for "[p]ayment of an amount that is disputed by the District." REM contends the District owes it the full contract price, including the remaining $220,600, and the District disputes that it owes REM this amount. Simply put, that is a claim.

*C. Timeliness*

The contract provides a claim must be submitted "within ten (10) calendar days from the date Contractor discovers or reasonably should discover, that an act, error or omission of District, its agents or employees, or action, condition, or other situation has occurred that may entitle Contractor to file a Claim." The District's position is that its February 4 letter to REM, which was delivered on February 5, triggered the 10-day deadline because it "conclusively established" REM "had actual knowledge of an act or action of the [D]istrict . . . that entitled REM to present a claim." The District thus contends REM had until February 15 to file a claim, and its claim, which was filed on March 6, was untimely. REM's position is that, assuming it had to file a claim, it was the District's February 26 letter that triggered the 10-day deadline. The trial court agreed

---

**10** An example might be a demand by a contractor to approve a proposed change order for extra work the District asked it to do. (See, e.g., *Weeshoff Constr. Co. v. Los Angeles County Flood Control Dist.* (1979) 88 Cal.App.3d 579, 588-589.)

15

with REM, and found "the claim was timely filed, March 6th." We conclude this finding is supported by substantial evidence.

David Schell, REM's senior project manager, testified on behalf of REM. He testified that, until he received the District's February 26 letter, he did not know or have reason to know the District was not going to pay him the remainder of the contract price. It was only when he received the February 26 letter that he determined REM "probably should file a claim." Until that time, Schell was committed to completing all punch list items and he thought the District would pay the remainder of the contract price once he did so. He testified it was "very common" for there to be "multiple punch lists" on a project, and "[n]ormally if . . . they give you the punch list, you have time to complete the punch list, procure materials, and get the subcontractors lined up, and you keep working on the punch list until it's complete." He also testified, "My commitment to the district was, I was going to complete this project, and complete all punch list items, and I did not understand until all the way until the very end and we got the letter on February 26th that they weren't going to pay me." Until that time, his understanding was "if I complete the items, then in my mind these items that they alleged that we didn't complete that aren't on our plans and specs, someone will get to whoever they need to get to and say, hey, look this isn't even in their scope of work. Why are you back-charging someone for items that aren't in their scope of work? [¶] So I believed that we were going to . . . work out our disagreements, and then we would go our separate ways, I would have the project done, and the close-out documents documented. [¶] That's what I believed in my heart the whole way through this project." Schell also testified REM submitted its last invoice to the District on February 13 and it usually takes 25 to 30 days for an invoice to be paid. After submitting the invoice, "I'm waiting for [it] to be processed, thinking that everything is fine, and they are going to do that, because that would be normal, and that never happened." Instead, approximately two weeks later "this February . . . 26th letter came that said, hey, we are not going to pay you, and at that point I realized we weren't

16

going to get paid, so that's why I filed a claim." Given the communications between the parties, we cannot say Schell's belief was unreasonable.

Those communications show the parties were still working together on the punch list in January and REM was continuing to cross items off that list. On January 15, for example, the parties exchanged e-mails about work REM was performing that day. That evening, REM stated it would provide a "work plan" listing additional punch list items it planned on completing and projected dates for each item. The District grumbled, but stated it would allow REM to submit a work plan for its consideration, and it acknowledged it "has a good faith and fair dealing obligation." When REM then notified the District the work plan would be a few days late, it responded, "Ok."

As another example, on January 9 and again on January 27, the District sent REM a spreadsheet or "current punch list" of items that still needed to be completed. The January 9 letter stated, "Hopefully . . . the Parties can work cooperatively to resolve these issues in a timely manner," which supports a finding the parties were still working cooperatively on the punch list. Moreover, a comparison of the two punch lists demonstrates REM had satisfactorily completed at least some of the items on the earlier list, which also supports a finding the parties were still working cooperatively to resolve the punch list issues. For example, the January 9 punch list estimated the cost to the District to self-perform all items thereon was approximately $88,000, while the January 27 list estimated the cost would be approximately $69,000. In other words, between January 9 and January 27, REM continued to work on the punch list and completed approximately $20,000 worth of work. As another example, the January 9 punch list identifies 38 doors to paint, while the January 27 punch list identifies just 12 doors. The January 9 list also states REM still has to "[a]dd floor base at science casework skirts" and "[a]ddress hot water connection at Science Lab," while these two items do not appear on the January 27 punch list. Again, this demonstrates REM was continuing to correct punch list items to the District's satisfaction.

17

On January 30 and January 31, REM sent letters to the District regarding the District's contention that "the punch list work performed in January is deficient" and it asked the District to identify what work was deficient and why it was deficient. It also argued the District could not recoup monies it had previously paid pursuant to approved change orders. This supports a finding that the parties were still working on both the punch list and the overbilling issue at that time.

Despite the progress the parties continued to make on these issues in January, the District's position is that its February 4 letter triggered the claim presentation requirement because it enclosed the board resolution directing the superintendent to "disburse any remaining portion of the Contract Price . . . minus any amounts not otherwise due the Contractor including by way of illustration and not by limitation": (1) $30,708.01 for overbilling, (2) $69,960.51 for remaining unperformed or deficiently performed work, and (3) $2,599.20 for additional inspection fees. The District contends this resolution made it clear it was not going to pay the entire balance of the contract price, which provided REM with all the information it needed to trigger the claim presentation requirement. As the trial court implicitly found, however, the District's letter demonstrates the parties were still trying to resolve their disputes. For example, the letter opens by acknowledging receipt of REM's January 30 and 31 letters and stating it "intends to defer responding to that correspondence until after it received the promised documentation substantiating . . . the . . . proposed change orders submitted by REM." It is reasonable to assume that, until the District's deferred response was forthcoming, the parties were still trying to resolve the overbilling issue.

The letter also states, "your correspondence of January 30 . . . indicates that you object to the adequacy of the District's existing documentation [regarding the work REM allegedly neglected to perform] and that further inspection and documentation of the same is necessary. The District is more than happy to oblige this demand in this instance but notes that it will be at REM's expense." Again, it is reasonable to assume this

18

signified that further documentation and/or inspection could demonstrate REM's work was satisfactory.

The letter also states, "If REM has a proposal as to how it intends to resolve this dispute, it can communication that proposal to our office in writing," and, "The District clearly is interested in a cooperative close-out of the Project." Again, this supports a finding the parties were still trying to cooperatively resolve their disputes.

This understanding is reiterated by an e-mail exchange between the parties a few days after the February 4 letter. REM asked the District to "confirm that [it] refuses to allow REM to perform the painting work as proposed in my letter to you of January 30, 2020. Please provide a yes or no answer." The District responded, "The answer to your question is, at present, yes." "[T]he project is now complete . . . . [REM] submitted a proposal . . . to perform one fifth (1/5) of the remaining work for the project, and the District told you that it would respond to the letters in which that proposal was contained in more detail after it had a chance to review the substantiating documentation for REM's change orders . . . which [REM] has promised to provide next week. Unless and until that proposal is accepted and reduced to an agreement to the contrary, REM is not to perform the painting work it proposed. Again, the District intends to respond in more detail to your January 30 and 31 correspondence after it receives the substantiating documentation you have promised to provide next week." This e-mail supports a finding the District was still open to allowing REM to finish some of the remaining punch list work after it had a chance to review the substantiating documentation regarding the overbilling issue. It also supports a finding the parties were still working on the overbilling issue, and that the substantiating documentation might convince the District there was no overbilling. In other words, the District was waiting for the substantiating documentation before it decided how to proceed. REM submitted the substantiating documentation on February 14; the February 26 letter followed shortly thereafter; and REM filed a claim nine days later.

Viewed in its totality, we conclude the evidence discussed above is sufficient to support the trial court's finding REM's claim was timely.

D. *Mediation*

Even if the claim was timely filed, the District argues there is a second bar to this lawsuit: REM failed to complete the last step of claim resolution process, namely, mediation. The claim resolution process effectively has three successive steps: (1) claim initiation or presentation; (2) a meet and confer conference; and (3) mediation. It is undisputed the parties never completed the third step of the process (or the second step for that matter), and the District contends that REM's breach of contract claim is thus barred. As noted above, the trial court rejected the District's argument, finding "[t]here were requests for mediation" and "for that meet-and-confer conference that were ignored" by the District. These findings are supported by the evidence.

On June 1, 2021, REM sent the District a written "demand for the informal meet and confer process," the record contains no evidence the District ever responded to that demand, and the District's counsel acknowledged at the hearing on the motion for judgment that REM "made that demand, and at that point we remained silent." The trial court's finding that the District ignored REM's demand for the meet and confer conference is thus supported by the evidence. The District suggests the demand was untimely because it was submitted over one year after REM submitted its claim. We disagree because the contract contains no deadline for demanding an informal conference, even though it contains deadlines for almost every other step of the claim resolution process.

The trial court also cited an e-mail from the District's counsel to REM's counsel that stated, "As for mediation, the District has *always* said no." (Italics added.) The trial court noted, " 'Always' means . . . going all the way back to the beginning." Given counsel's acknowledgement that the District had "always said no" to mediation, the

20

District cannot now be heard to argue that REM's lawsuit is barred because it failed to complete mediation.

The District challenges the trial court's conclusion that mediation was not required under these facts. Its position is that mediation is a condition precedent to litigation, and because mediation never occurred, REM's lawsuit is barred. The trial court, however, found that "[t]he happening of the meet-and-confer conference is . . a condition precedent to then setting up the mediation." We agree.

"A condition precedent is an act which must be performed . . . before the promisor's duty of performance arises." (*Sosin v. Richardson* (1962) 210 Cal.App.2d 258, 264.) "Under the law of contracts, parties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event. [Citations.] Thus, a condition precedent is . . . an act of a party that must be performed . . . before the contractual right accrues or the contractual duty arises." (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313.) "Where one party's obligation is dependent on the prior proper performance of the other party, and that other party does not perform, the obligation is excused." (*Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 592.) The failure of one party to perform a condition precedent thus excuses the other party's performance which was dependent on it. (See *Mainieri v. Magnuson* (1954) 126 Cal.App.2d 426, 429.)

The contract in this case provides, "the District *shall* schedule a meet and confer conference within 30 days" of receipt of a demand by the contractor. (Italics added.) It goes on to provide, "Within 10 business days following the conclusion of the meet and confer conference . . . the District *shall* provide the Contractor a written statement identifying the portion of the claim that remains in dispute . . . . Any disputed portion of the Claim, as identified by the contractor in writing, *shall* be submitted to nonbinding mediation." (Italics added.) "[T]he term 'shall' has long been considered mandatory under California's contract interpretation rules." (*Segal v. Silberstein* (2007)

21

156 Cal.App.4th 627, 634.) By its use of the word "shall," the contract thus effectively creates three successive obligations or duties. First, the District has an obligation to schedule a meet and confer conference upon demand by REM. Second, the District has an obligation to provide REM with a written statement identifying that portion of the claim that remains in dispute following the conclusion of the conference. And third, REM has an obligation to submit any disputed portion of the claim to mediation. Where the parties have agreed the District has an obligation to schedule the conference and to provide REM with the written statement, those acts must be performed before REM's obligation to submit its claim to mediation arises. (See, e.g., *Platt Pacific, Inc. v. Andelson, supra*, 6 Cal.4th at pp. 313-314.) Because the evidence showed the District failed to comply with either of its obligations, REM's obligation to submit its claim to mediation never arose.

Because we affirm the judgment, we need not address the District's argument regarding attorney fees.

## DISPOSITION

The judgment is affirmed and REM shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                  /s/
                                                EARL, P. J.


We concur:


/s/
HULL, J.


/s/
FEINBERG, J.